SONDHEIM *v.* FECHENBACH.

1. WILLS — CONSTRUCTION — REMAINDERS — PERSONS ENTITLED TO SHARE.

Where a will devises the homestead to the widow for life, remainder to "my children hereinafter named," and all testator's children are subsequently named in the will, the estate goes to them all share and share alike.

2. SAME—CODICILS.

A codicil is treated as a part of the will.

3. SAME—CONSTRUCTION—EXTRINSIC EVIDENCE.

Not only the four corners of the instrument, but the amount of testator's estate and his surroundings, are to be considered in determining the meaning of ambiguous provisions in a will.

4. SAME—CODICIL—SUBSTITUTIONAL BEQUEST.

Evidence examined and *held* that a bequest contained in a codicil was intended as a substitute for a similar one of less amount to the same heir in the body of the will, the instrument being ambiguous.

Appeal from Wayne; Donovan, J. Submitted April 5, 1904. (Docket No. 11.) Decided July 27, 1904.

Bill by Rudolph Sondheim against Emma Fechenbach and others to construe the will of Solomon Sondheim, deceased. From a decree for complainant, defendants appeal. Modified.

*Joseph R. Nolan,* for complainant.

*James H. McDonald* (*Adolph Sloman,* of counsel), for defendants.

MOORE, C. J. This bill is filed for the purpose of obtaining a construction of the will of Solomon Sondheim, deceased. The material portions of the will, which was first made in 1897, read as follows:

"I give to my wife, Eva Sondheim, during her natural

life and while she remains my widow, the use and enjoyment of my household furniture, ornaments, and appurtenances, and also of the residence which I at the time of my death may be occupying as a home for my family, to be kept and used by her as a house for herself.  In case my wife shall not survive me or at her death or remarriage, if she shall survive me, I give and devise said homestead, furniture, ornaments, and appurtenances to my children hereinafter named, and their issue, share and share alike, except the piano which I give to my daughter Emma, to be taken by her when she shall marry, or at my wife's death.  *  *  *  All the rest and residue of my estate of every name and nature and wheresoever situate, I give, devise, and bequeath to my trustees hereinafter named and his successors, but only in trust for the following purposes:  *  *  *  Out of the income of the said property to pay to my wife during her natural life, while she remains my widow, for the purpose of maintaining the house for herself, the sum of $10.00 each and every week commencing at the day of my death.  *  *  *  After the death or marriage of my wife, to set aside the sum of two thousand dollars, and to give the income therefrom, monthly, to my daughter Tilly or her guardian during her lifetime, whether she marry or not, and at her death the said principal sum to her issue, if she have any.  After the death of my wife, to give to Theresa $4,000, Emma $2,000, Otto $1,000, and divide the balance between Philip, Rudolph, and Louis, paying to each son or his issue and my daughter Theresa or her issue, their shares immediately, and to my daughter Emma her share when she shall marry; but if any sums are obtained by my children from insurance on my life, the sum so obtained shall be deducted from the sum hereby given to him or her.  To hold said fund of $2,000 until the death of my said daughter Tilly and also the portion of my daughter Emma until she shall marry."

This will was resigned and republished on the 5th of February, 1901.  It is the claim of the defendants it was done in the forenoon, and that in the afternoon a codicil was added, the material parts of which read:

"I, Solomon Sondheim, do make, publish, and declare this to be a codicil to my last will and testament dated this day.  *  *  *  *  *Second*, I have agreed that upon her wedding day I will give to my daughter Emma Sondheim, the

137 MICH.—25.

sum of three thousand ($3,000) dollars, and in case I shall not live so long I direct that she be paid that sum upon her wedding day out of my estate."

It is the claim of appellee that the resigning of the original will and the making of the codicil were contemporaneous. It is contended by the complainant, and the circuit judge decreed, *first*, that the homestead on the death of the mother passed to the three sons, Rudolph, Philip, and Louis; that the $3,000 which the testator recites in the second paragraph of the codicil was in lieu of the legacy of $2,000 provided for in the body of the will; and that as the testator had paid that sum to her on her marriage by way of advancement, she no longer had any interest in the property of the estate. The case is brought here by appeal.

The bill avers the testator at his death left $8,958.35 of personal property, after deducting expenses of administration. The answer admits this averment to be true. The testator left surviving him a widow, who died nearly a year after his death, three daughters, and four sons— Theresa, Emma, Matilda, Philip, Otto, Rudolph, and Louis. Emma was married on the 12th of March previous to her father's death, at which time she was paid $3,-000. Counsel say the following points are involved: *First*. Did the homestead, under the terms of the will, pass to the three sons or to all of the children, share and share alike ? *Second*. Was the $3,000 given by the codicil substitutional or additional to the legacy of $2,000 given by the will ? *Third*. Was the court in error in admitting oral testimony as to the testator's intention, or was such intention to be determined from the instruments themselves ?

We think the court erred in holding that the real estate should not be shared by all the children. The provision of the will is that at the death of the wife the "homestead shall go to my children hereinafter named." Later provisions of the will name all of the children.

The other questions are more troublesome. Codicils are

treated as parts of the will.   Schouler on Wills (3d Ed.),
§ 7.   The same author says:

. "The cardinal rule of testamentary construction, as al-
ready intimated, is that the plain intent of the testator as
evinced by the language of his will must prevail, if that
intent may be carried into effect without violating some
deeper principle of public policy.   And whatever respect
the construction put upon corresponding words in other
wills may deserve from the court by way of precedent,
this plain and lawful intent of the particular will should
not be defeated.   Courts have spoken of such intention
as the 'law,' the 'pole star,' or the 'sovereign guide,' when
referring to this governing principle of testamentary
causes; and the doctrine, in one formula or another, is
constantly affirmed in the reports.   But it is the intention
of the testator, as expressed in his own will, which governs;
and this intention must be discerned through the words of
the will itself, as applied to the subject-matter and the
surrounding circumstances.   In other words, the plain
and unambiguous words of the will must prevail, and
cannot be controlled or qualified by any conjectural or
doubtful constructions growing out of the situation, cir-
cumstances, or condition of the testator, his property, or
the natural objects of his bounty.   And since the interpre-
tation and exposition of certain phrases found in similar
wills are entitled to weight, it may sometimes happen
that the intention as expounded by the courts differs from
the testator's own private intention and understanding.
For the true inquiry in interpreting the will is not
what the testator meant to express, but what the words
used in the will express.   Yet every will should be inter-
preted, as far as possible, from the standpoint apparently
occupied by the testator; and attendant circumstances,
such as the condition of his family, and the amount and
character of his property, may and ought to be taken into
consideration as part of the res gestæ where the language
is not plain nor the meaning obvious."   Schouler on Wills
(3d Ed.), § 466.

See, also, *Eyer* v. *Beck*, 70 Mich. 179 (38 N. W. 20);
*Wales* v. *Templeton*, 83 Mich. 177 (47 N. W. 238).   In
*Barnes* v. *Marshall*, 102 Mich. 248 (60 N. W. 468), Jus-
tice LONG, speaking for the court, said:

"The general rule for the interpretation of wills is that it

is the duty of courts to give full and complete effect to the testator's intention, and carry out such intention if it be lawful. *Rock River Paper Mill Co.* v. *Fisk,* 47 Mich. 212 (10 N. W. 344); *Cummings* v. *Corey,* 58 Mich. 494 (25 N. W. 481); *Eyer* v. *Beck,* 70 Mich. 179 (38 N. W. 20). Courts are bound to carry out the real design of the testator as derived from a comparison of all the parts of the will; and the meaning of all words and phrases must, if possible, be harmonized. *Bailey* v. *Bailey,* 25 Mich. 185."

In *Hamlin* v. *Express Co.,* 107 Ill. 443, the rule is stated that "the latter part of the will is to be considered no less than the former part; and, to the extent there is repugnance, the language of the former part is to be read as modified by that of the latter part." In section 467 of Schouler on Wills it is said:

" 'The struggle in all such cases,' observes Judge Story, 'is to accomplish the real objects of the testator, so far as they can be accomplished consistently with the principles of law; but in no case to exceed his intention fairly deducible from the very words of the will.' *Nightingale* v. *Sheldon,* 5 Mason, 336. In fine, where the meaning of the language of the will is plain, the court of construction does not go outside to discover what the testator intended; but where the provisions are doubtful, or may admit of more than one interpretation, the court will put itself in the situation of the testator, in reference to the property and the relative claims of the testator's family, the relations subsisting between him and them, and the circumstances which surrounded him, in order to be enlightened."

When the provisions made for Emma in the will are read, and the provision made for her in the codicil is then read, a doubt at once arises as to just what was intended by Mr. Sondheim. In the will he gave her a piano, which was to be taken by her when she shall marry. He also gave to her, after the death of his wife, $2,000, to be paid to her when she shall marry. These provisions were in the will when it was made in 1897, and remained in it when it was resigned. If, when the codicil was signed, he had said the $3,000 was to be in lieu of the

$2,000 named in the body of the will, or if it had been stated it was to be in addition thereto, it would have dispelled the ambiguity.   Unfortunately this was not done, and to arrive at his meaning we must consult not only the four corners of the instrument, but the amount of Mr. Sondheim's estate and his surroundings.   If we regard the $3,000 as all that was to be paid to Emma, then there is personal property enough to take care of all of Mr. Sondheim's gifts and pay the expenses of administration, and leave a small sum to be divided, as provided in the will, between Philip, Rudolph, and Louis.   If Emma is to have $5,000, as claimed, there would not only be no personal property to divide between the boys, but there would not be enough to pay, by a very considerable amount, the provisions made in the will for Theresa, Emma, and Otto.   Mr. Sondheim undoubtedly knew what property he had, and it is not probable he meant to make bequests which could not be paid.   Taking all the surroundings of the case, we think the provision of the codicil was to take the place of the sum provided for Emma in the body of the will.

The decree will be affirmed as to the personal property and reversed as to the real estate.

The other Justices concurred.